[Cite as *Accurate Elec. Constr., Inc. v. Ohio State Univ.*, 2019-Ohio-4992.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Accurate Electric Construction, Inc., | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 17AP-211 |
| v. | : | (Ct. of Cl. No. 2014-00961) |
| The Ohio State University, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on December 5, 2019

**On brief**: *McDonald Hopkins, LLC, Peter D. Welin*, and *Jason R. Harley*, for appellant. **Argued**: *Peter D. Welin*.

**On brief**: *Dave Yost*, Attorney General, *James E. Rook*, and *William Becker*, for appellee. **Argued**: *James E. Rook*.

APPEAL from the Court of Claims of Ohio

BROWN, J.

{¶ 1} Plaintiff-appellant, Accurate Electric Construction, Inc. ("Accurate"), appeals from a judgment of the Court of Claims of Ohio granting the motion for summary judgment of defendant-appellee, The Ohio State University (the "University" or "OSU"). For the reasons which follow, we affirm in part and reverse in part the judgment of the Court of Claims.

{¶ 2} The present case arises from a construction contract dispute between Accurate and the University regarding the South High Rise Dormitory Project (the "Project"). The Project consisted of demolition, renovation, and expansion of five student housing facilities located on the University's main campus. The Project was constructed under the multi-prime model of contracting.

{¶ 3}   There were "several moving parts and pieces" to the Project. (Purtee Depo. at 39.) The Project was split into three phases of construction with multiple bid packages. Phase one involved Bid Packages 1 through 5 and concerned utility relocation and chiller bunker work. Phase two involved Bid Package 6 and Bid Package 7 ("BP7") and concerned additions and renovations to the Stradley and Park dormitories. Phase three involved Bid Package 8 ("BP8") and concerned additions and renovations to the Smith, Steed, and Siebert dormitories.

{¶ 4}   Accurate served as the electrical prime contractor on BP7 and BP8. A document titled "General Conditions" was "the contract between the University and Accurate for the electrical work on the Project." (Mot. for Summ. Jgmt., Ex. A ("Purtee Affidavit"), ¶ 3; Ex. 1004 (the "contract").)

{¶ 5}   Smoot Construction Company ("Smoot") served as the University's construction manager on the Project, and Schooley Caldwell Associates ("Schooley") served as the associate architect on the Project (collectively, the University, Smoot, and Schooley will be referred to as the "Management Team"). When the Project began, contractors were informed that all communications regarding the Project were to be routed through Smoot. Greg Palmer was Smoot's project manager on the Project. Patricia Purtee was the University's senior construction manager on the Project.

{¶ 6}   Both BP7 and BP8 were on aggressive scheduling timelines. There was "[i]ntercoordination amongst those phases" of the Project, and each phase of construction depended on the preceding phase being completed timely. (Palmer Depo. at 30.) The Project completion dates were critical because the dorms needed to be ready to house incoming students when they arrived at the University.

{¶ 7}   As such, when contractors submitted their bids, the University informed them that all contractual milestone dates had to be met. Milestone dates "are target dates usually critical to certain activities on a schedule that will allow other work to follow." (Purtee Depo. at 52-53.) At pre-construction meetings, the University informed the contractors there would be no time extensions on the Project and no change to the contract end date.

{¶ 8}   The parties had a pre-construction meeting for BP7 on June 3, 2011, and the contractual occupancy date for the BP7 buildings was July 6, 2012. By February 2012, BP7

had fallen behind schedule and Smoot expressed concerns over meeting the deadline. BP7 ultimately finished a couple weeks behind schedule; the state issued a certificate of occupancy for the BP7 buildings on July 25, 2012.

{¶ 9}   Throughout the Project, the Management Team sought to take a "fair and reasonable" approach to dealing with contractor issues. (Palmer Depo. at 51.) Palmer noted that, if a contractor fell behind because of delays on predecessor activities, the Management Team would need the contractor to "make it up, then [the Management Team] would seek out to compensate them for whatever costs they incurred as a result of that." (Palmer Depo. at 51.)

{¶ 10}  Accurate experienced delays and other issues throughout BP7. On March 31, 2012, Accurate sent Smoot an e-mail indicating it was seeking additional compensation for the issues that arose during BP7. Accurate and Smoot communicated regarding Accurate's BP7 claims throughout 2012 and early 2013. The Management Team and Accurate resolved Accurate's BP7 claims at a field level resolution meeting on January 24, 2013.

{¶ 11}  The pre-construction meeting for BP8 occurred on March 26, 2012. BP8 ultimately completed on time; the state issued a certificate of occupancy for the BP8 buildings on June 17, 2013. The University began occupying the BP8 dorms on August 15, 2013.

{¶ 12}  Accurate experienced a number of issues throughout BP8. In September 2012, a pipe burst in an underground tunnel on the Project and caused substantial flooding. The flood caused "damage to a lot of equipment in the bunker," and Accurate "performed some of the remedial work to get things back up and running" after the flood. (Purtee Depo. at 200.)

{¶ 13}  In January 2013, the Management Team realized that Accurate had installed flexible conduit on the fire alarms in both the BP7 and BP8 buildings. Although the contract specifications called for rigid conduit, Accurate had installed flexible conduit in the mockup room without objection from the Management Team. On January 21, 2013, Smoot issued a notice to comply to Accurate stating the flexible conduit did not comply with the Project documents.

{¶ 14}  Purtee informed Accurate the University could force Accurate to "tear off the drywall in five buildings" and "backcharge them" for the related costs. (Purtee Depo. at

209.) Purtee explained that, although it "wouldn't be appropriate" to actually make Accurate tear out the drywall, it remained "an option for the University." (Purtee Depo. at 211; Palmer Depo. at 184.) The University ultimately sought to obtain a credit from Accurate for the flexible conduit. The University "established a change order and provided [Accurate] with the opportunity to sign the change order" regarding the proposed credit for the flexible conduit, but Accurate did not agree with the amount of the credit and refused to sign the change order. (Purtee Depo. at 211.)

{¶ 15} On February 13, 2013, Smoot sent change order 363 to Tony Evans, Accurate's project manager, and asked Evans to sign the change order. Change order 363 was a zero cost change order which revised a number of the milestone dates in BP8. Although change order 363 pushed some of the milestone dates back by several months, it did not change the Project completion date. Accurate refused to sign change order 363 and the University processed it unilaterally, i.e., without Accurate's signature.

{¶ 16} Accurate was supposed to install spare conduit in a trench at the 12th Avenue crossing. Due to miscommunication between Accurate and the geothermal contractor, Accurate missed the initial trench opening. The trench had to be reopened for Accurate to install the conduit. In a June 10, 2013 e-mail, Palmer informed Evans that the Management Team believed both contractors should share the expense of reopening the trench. Accurate did not agree that it should have to share the cost of the trench work and the issue was resolved by "a unilateral process change order." (Palmer Depo. at 208.)

{¶ 17} Thus, throughout BP8, the Management Team unilaterally processed a number of change orders concerning Accurate. Purtee explained she processed change orders unilaterally in order "to make sure that the contractors got paid something on their change orders, whether they agreed to the amount or not." (Purtee Depo. at 284.) Purtee admitted she did not know if the contract allowed for change orders to be processed unilaterally.

{¶ 18} Article 7 of the contract, titled "Contract Modifications," provided for three different methods of a contract modification: a change order, a field work order, or a minor change in the work. Minor changes were changes which did not affect the contract sum (the amount payable to the contractor) or the contract time (the time period for the completion of the work). A change order was a written instrument "signed" by the Management Team

and the contractor, stating their agreement on the change to the work, the amount of adjustment to the contract sum, and the extent of adjustment to the contract time. Thus, a change order had to be signed by both the Management Team and the contractor. By signing a change order "the Contractor irrevocably certifie[d] that the elements of a Change Order [were] completely satisfied, and waive[d] all rights, if any, to seek further adjustment of the Contract Sum or Contract Time." (General Conditions, 7.3.2.)

{¶ 19} In contrast, the contract provided that a field work order "shall be used to direct a change in the Work in the absence of total agreement on the terms of a Change Order." (General Conditions, 7.2.2.3.) Upon receipt of a field work order, the contractor had to "promptly proceed with the change in the Work involved." (General Conditions, 7.2.2.4.) A contractor could sign the field work order to indicate acceptance of its terms. If the contractor did not sign the field work order, the University was obligated to determine the adjustments, if any, to the contract sum and contract time caused by the field work order. If the contractor did not agree with the University's determination regarding the adjustment to the contract sum and/or contract time resulting from a field work order, the contractor was obligated to "initiate a claim under Article 8 within 10 days of the date on which the [University] issues its determination." (General Conditions, 7.2.2.7.)

{¶ 20} Article 8 of the contract, titled "Dispute Resolution," obligated a contractor to "initiate every claim by giving written notice of the claim" to the Management Team "within 10 days after occurrence of the event giving rise to the claim." (General Conditions, 8.1.2.) Article 8 provided that a contractor's failure to initiate a claim "as and when required under this paragraph 8.1 shall constitute the Contractor's irrevocable waiver of the claim." (General Conditions, 8.1.4.)

{¶ 21} Accurate brought the issues that arose throughout BP8 to the attention of the Management Team. On October 16, 2013, the Management Team held a field level resolution meeting with Accurate to try to resolve some of Accurate's BP8 claims. Some claims were resolved as a result of the meeting and others remained pending.

{¶ 22} By the end of December 2013 it became clear to Accurate "that the field level discussion[s] that were ongoing would not lead to total agreement" between the parties on the BP8 issues. (Memo in Opp. to Summ. Jgmt., Ex. A, Evans Affidavit ("Evans Affidavit"), at ¶ 13.) As such, on December 23, 2013, Accurate filed a request for a change order seeking

additional compensation from the University on Accurate's BP8 claims. The December 23, 2013 change order identified the following list of unpaid changes to Accurate's work:

A       Flex to smokes         $12,000.00
B       Conduit to cable tray CM's Misuse of R.S. Means $103,000.00
C       Best Locks    $3,881.00
D       Viking Phones         $10,733.48
E       Additional Beams    $3,389.80
F       Flooding of Bunker  $5,167.00
G       Graphic Display Panels PK 8         $17,396.00
H       12th Ave crossing    $4,682.23
I       Mod bus Meters       $2,558.00
J       Fixture Deduct bulletin 638                 $34,693.00
K       Technology Conduit Fill     $3,166.14
L       Manipulating      Milestones      Change      Order $1,390,480.00

(Evans' Aff., Ex. A-2.)

{¶ 23} Accurate notes that Smoot rejected its change order request the following day on December 24, 2013.  Accurate filed its Article 8 claim ten days later, on January 3, 2014. Accurate's January 3, 2014 Article 8 claim sought compensation for the following issues: (A) flexible conduit for fire alarm system, (B) unilaterally processed change orders 416, 503R1, 682, 612A, 612B, 668R2, 662, 693, 683, 727, 710, 671, 703R2, (C) best locks, (D) Viking phones, (E) unilaterally processed change order 587, (F) display panels bulleting 633, (G) 12th Ave. Crossing, (H) modification of bus meters, (I) data and light fixtures in the connector bulletin 632, (J) technology conduit fill, (K) change order 877, and (L) change order request for disputed milestone impact.

{¶ 24} Accurate's claims proceeded through the Article 8 process. The University architect ruled on the claims on June 25, 2015. The architect addressed the merits of each claim and additionally noted the claims were untimely. The architect denied most of Accurate's claims, but granted Accurate's claims for the display panels bulletin 633 and the technology conduit fill requirements. The architect stated its decision to grant the two claims was made "without waiving any rights or provisions of the contract, including but not limited to the late submission of this claim." (Purtee Aff., Ex. 7.)

{¶ 25} On December 9, 2014, Accurate filed its complaint in the Court of Claims asserting the following counts: (1) breach of contract, (2) equitable adjustment, (3) breach

of express and implied warranties, and (4) breach of the duty of good faith and fair dealing. Accurate asserted it had exhausted its administrative remedies, and asserted that despite its "requests for its outstanding contract balance, OSU continue[d] to hold $304,514.13 in undisputed contract balance separate and apart from Accurate's claim." (Compl. at ¶ 31.)

{¶ 26} Accurate requested a referee be assigned to hear and determine the case pursuant to R.C. 2743.03(C)(3).[1] The Supreme Court of Ohio appointed a referee.

{¶ 27} The University filed a Civ.R. 56 motion for summary judgment on March 1, 2016. The University asserted it was entitled to summary judgment on Accurate's breach of contract and equitable adjustment claims because Accurate did not file its underlying claims against the University within the ten-day time limit set forth in Article 8 of the contract. Regarding the third and fourth counts of the complaint, the University asserted that Accurate "could not identify any real express or implied warranties it alleges the University breached," and asserted that a claim for breach of the duty of good faith and fair dealing could not "stand without a separate breach of contract claim." (Mot. for Summ. Jgmt. at 2.) The University asserted Accurate did not have a right to receive final payment under the contract as Accurate had not completed the required close-out documents.[2]

{¶ 28} Accurate filed a memorandum in opposition to the University's motion for summary judgment on May 27, 2016. Accurate asserted the Court of Claims should deny the University's motion as Accurate had "complied with the Article 8 notice requirements" and/or because the University "waived the Article 8 notice requirements by its course of conduct." (Memo. in Opp. at 3.) Accurate noted it complied with the Article 8 notice requirement by filing its claim within ten days from the date the University denied its change order request. Accurate asserted the University waived the Article 8 requirements because it "waived the Article 8 requirements for other contractors on the Project, it waived

---

[1] R.C. 2743.03(C)(3) provides that when a dispute regarding a public construction project is filed in the Court of Claims, either party may request, and the Chief Justice of the Supreme Court shall appoint, "a single referee or a panel of three referees. The referees need not be attorneys, but shall be persons knowledgeable about construction contract law, a member of the construction industry panel of the American arbitration association, or an individual or individuals deemed qualified by the chief justice to serve."

[2] Purtee averred that Accurate was not entitled to final payment because it had yet to submit the following documents: formal payment application # 16, final payment application, retainage payment application lien waivers, prevailing wage from October 1, 2013 to the last date of all work, consent of surety, certificate of contract completion, certificate of warrant commencement, and the certificate of equipment demonstration. (Purtee Aff. at ¶ 36.)

the Article 8 requirements for Accurate's claim on [BP7] of the Project, and it paid for some of Accurate's claims on [BP8] of the Project." (Memo. in Opp. at 36.)

{¶ 29} On June 9, 2016, the University sought leave to file a reply to Accurate's memorandum in opposition instanter. Accurate filed a memorandum in opposition, asking the court to deny the University's motion for leave or, if it granted the motion, to grant Accurate leave to file a surreply brief.

{¶ 30} On August 18, 2016, the referee issued a recommendation granting the University's motion for summary judgment on Counts 1 and 2 of the complaint. The referee also granted the University's motion for leave to file a reply brief, and found that a surreply brief from Accurate was unnecessary.

{¶ 31} The referee concluded that Article 8 of the contract was "clear and unambiguous" and that all of Accurate's claims " 'arose' prior to ten days before the assertion of [Accurate's] claim." (Recommendation of the Referee on the Mot. for Summ. Jgmt. at 7.) Specifically, the referee stated that because students were occupying the dorms by August 15, 2013, "all of the matters that 'arose' must have taken place at least four months prior to the filing of the claim." (Recommendation of the Referee on the Mot. for Summ. Jgmt. at 7.) As such, the referee concluded that Accurate's claims for breach of contract and equitable adjustment were untimely under the Article 8 notice of claims provision.

{¶ 32} Regarding Accurate's waiver argument, the referee acknowledged that Accurate presented a number of "examples that it believes demonstrates that OSU, by its conduct, waived the Article 8 requirements throughout the Project." (Recommendation of the Referee on the Mot. for Summ. Jgmt. at 9.) However, the referee concluded there was "no evidence that OSU waived the Article 8 requirements for this project." (Recommendation of the Referee on the Mot. for Summ. Jgmt. at 9.)     The referee concluded the University was entitled to summary judgment on the contract balance issue because Accurate failed to respond to the University's motion for summary judgment with evidence demonstrating it had filed the close-out documents.

{¶ 33} The referee noted there was a lack of argument and/or explanation from the parties regarding Accurate's claims for breach of warranties and breach of the duty of good faith and fair dealing. As such, the referee requested the parties submit additional briefing

on these claims. On September 2, 2016, the parties filed briefs in response to the referee's request for additional briefing.

{¶ 34} On September 2, 2016, Accurate also filed the following objections to the referee's August 18, 2016 recommendation: (1) the referee erred by weighing the evidence, (2) the referee misunderstood Accurate's argument regarding the University's failure to comply with its contractual obligations, (3) the referee misapplied the contractual notice requirement, (4) the University waived the Article 8 notice requirements by failing to follow its own contract procedures, (5) the referee erred in granting summary judgment as to the remaining contract balance, and (6) the referee erred by granting the University leave to file a reply brief but denying Accurate's motion for leave to file a surreply brief.

{¶ 35} On November 18, 2016, the referee issued a decision granting the University summary judgment on Counts 3 and 4 of the complaint. The referee concluded Accurate's breach of warranties claim was substantively a breach of contract claim, and that Accurate waived the claim by failing to give timely notice under Article 8. The referee further concluded that, because there was "no genuine issue of material fact regarding whether or not [Accurate] waived its right to pursue an Article 8 claim related to breach of contract, the claim for a breach of good faith and fair dealing must consequentially be dismissed." (Nov. 18, 2016 Referee Decision at 5-6.) Accurate filed an objection to the referee's November 18, 2016 decision on December 1, 2016.

{¶ 36} On February 15, 2017, the Court of Claims issued a decision and judgment entry overruling Accurate's objections, adopting the referee's recommendations as its own, and granting the University summary judgment. The court concluded the referee had not weighed the evidence in resolving the waiver issue, as the referee found "no evidence of OSU's waiver." (Decision at 3.) The court stated that, although its "independent review of the record" demonstrated that "Accurate did provide some evidence which it argued demonstrates OSU's waiver of the Article 8 process," the court found "no evidence in the record that OSU waived the Article 8 process." (Decision at 3.)

{¶ 37} The court observed the referee made "no determination as to when, during the project, the individual claims actually arose." (Decision at 5.) Regardless, because Accurate did not file its claims until "four months after the completion of the project," the court determined Accurate's claims were untimely under Article 8. (Decision at 5.) As such,

the court concluded Accurate had waived its claims against the University by failing to comply with the Article 8 notice requirements.

{¶ 38} As Accurate failed to produce evidence demonstrating that it had filed its final pay application, the court concluded the University was entitled to summary judgment on the contract balance. The court agreed with the referee's conclusion that Accurate's breach of warranties claim was substantively a breach of contract claim, which Accurate waived due to its untimely Article 8 notice. The court also agreed that, in the absence of a breach of contract claim, Accurate's breach of the duty of good faith and fair dealing claim had to be dismissed.

{¶ 39} Accurate appeals, assigning the following errors for our review:

> [I.] THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT BECAUSE APPELLANT PRESENTED GENUINE ISSUES OF MATERIAL FACT THAT THE TRIAL COURT MISAPPLIED THE CONTRACTUAL NOTICE REQUIREMENTS.
>
> [II.] THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT BECAUSE APPELLANT PRESENTED GENUINE ISSUES OF MATERIAL FACT THAT APPELLEE WAIVED THE CONTRACTUAL NOTICE REQUIREMENTS, AND THE TRIAL COURT IMPROPERLY WEIGHED THE EVIDENCE.
>
> [III.] THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT BECAUSE GENUINE ISSUES OF MATERIAL FACT EXIST THAT APPELLANT IS ENTITLED TO THE UNDISPUTED CONTRACT BALANCE.
>
> [IV.] THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT BECAUSE THE REFEREE INCORRECTLY GRANTED APPELLEE LEAVE TO FILE A REPLY BRIEF – WHICH IMPROPERLY RAISED NEW ARGUMENTS FOR THE FIRST TIME – AND DENIED APPELLANT'S MOTION FOR LEAVE TO FILE A SUR-REPLY TO ADDRESS THESE NEW ARGUMENTS.
>
> [V.] THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT BECAUSE APPELLEE FAILED TO MEET ITS INITIAL BURDEN WITH

RESPECT TO COUNTS III AND IV OF APPELLANT'S COMPLAINT.

[VI.] THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT BECAUSE APPELLANT DEMONSTRATED THAT GENUINE ISSUES OF MATERIAL FACT EXIST REGARDING COUNTS III AND IV OF APPELLANT'S COMPLAINT.

{¶ 40} Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997). "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court level are found to support it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 41} Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997). "Where the evidence presented allows conflicting inferences, a court considering a summary judgment motion may not weigh the evidence." *Thyssen Krupp Elevator Corp. v. Constr. Plus, Inc.*, 10th Dist. No. 09AP-788, 2010-Ohio-1649, ¶ 20.

{¶ 42} When seeking summary judgment on grounds that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the non-moving party has no evidence to prove its case. *Id.* Rather, the moving party must

affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the non-moving party has no evidence to support its claims. *Id.* If the moving party meets its burden, then the non-moving party has a reciprocal burden to set forth specific facts showing there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293. If the non-moving party does not so respond, summary judgment, if appropriate, shall be entered against the non-moving party. *Id.*

{¶ 43} R.C. 2743.03(C)(3) provides that proceedings before a referee appointed to hear a public construction contract case shall be in accordance with Civ.R. 53. Civ.R. 53(D)(4)(d) provides that "[i]f one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections." "In reviewing objections to a [referee's] decision, the trial court must make an independent review of the matters objected to in order 'to ascertain [whether] the [referee] has properly determined the factual issues and appropriately applied the law.' " *Randall v. Eclextions Lofts Condominium Assn.*, 10th Dist. No. 13AP-708, 2014-Ohio-1847, ¶ 7, quoting Civ.R. 53(D)(4)(d). *See also Roe v. Heap*, 10th Dist. No. 03AP-586, 2004-Ohio-2504, ¶ 34, quoting *Nolte v. Nolte*, 60 Ohio App.2d 227 (8th Dist.1978), paragraph two of the syllabus. An appellate court reviews a trial court's adoption of a referee's decision for an abuse of discretion. *Meccon, Inc. v. Univ. of Akron*, 10th Dist. No. 12AP-899, 2013-Ohio-2563, ¶ 15.

{¶ 44} Accurate's first assignment of error asserts the Court of Claims erred in granting the University's motion for summary judgment because the Court of Claims misapplied the contractual notice provisions.

{¶ 45} The construction and interpretation of written contracts involves issues of law reviewed de novo by appellate courts. *Alexander v. Buckeye PipeLine Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus. The purpose of contract construction is to realize and give effect to the parties' intent. *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244 (1974), paragraph one of the syllabus. "[T]he intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638 (1992). When " 'the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.' " *Holdeman v. Epperson*, 111 Ohio St.3d 551, 2006-Ohio-6209, ¶ 12, quoting *Shifrin* at 638.

{¶ 46} "The meaning of any particular construction contract is to be determined on a case-by-case and contract-by-contract basis, pursuant to the usual rules for interpreting written instruments." *Foster Wheeler Envirespouse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997). " '[W]hen a contract has an express provision governing a dispute, that provision will be applied; the court will not rewrite the contract to achieve a more equitable result.' " *Stanley Miller Constr. Co. v. Ohio School Facilities Comm.*, 10th Dist. No. 10AP-298, 2010-Ohio-6397, ¶ 12, quoting *Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. of Adm. Servs.*, 113 Ohio St.3d 226, 2007-Ohio-1687, ¶ 39.

{¶ 47} Article 8.1 of the contract provides as follows:

> 8.1.1   Every claim shall accrue upon the date of occurrence of the event giving rise to the claim.
>
> 8.1.2   Except as provided [for emergency situations], the Contractor shall initiate every claim by giving written notice of the claim to [Schooley] and the [University], through [Smoot], within 10 days after occurrence of the event giving rise to the claim, with the following exceptions:
>
> 8.1.2.1 The 10 day time limit on a claim arising from a determination of the [University] concerning a Field Work Order begins to run on the date on which the [University] issues its determination under subparagraph 7.2.2.7 or subparagraph 7.2.2.10, as applicable.
>
> 8.1.2.2 The 10 day time limit on a claim arising from the response of the [architect] to a Request for Interpretation begins to run on the date on which the [architect] issues the [architect's] response to the Request for Interpretation.
>
> 8.1.2.3 The 10 day time limit on a claim arising from the [architect's] determination concerning a Differing Site Condition begins to run on the date on which the [architect] issues the [architect's] determination under subparagraph 7.4.5.

{¶ 48} Thus, the contract provides that an Article 8 claim accrues upon the "occurrence of the event giving rise to the claim."

{¶ 49} The Court of Claims did not identify what date it believed the event or events occurred that gave rise to each of the individual claims itemized in the January 3, 2014

claim letter. Rather, the court concluded that each of the individual claims itemized in the January 3, 2014 claim letter must have been untimely because Accurate submitted its claim letter four months after construction was complete. In our view, the Court of Claims committed reversible error in ruling on the University's motion for summary judgment, when it failed to separately analyze each of the individual claims asserted in the January 3, 2014 claim letter in order to determine when and if an event giving rise to an Article 8 claim occurred.

{¶ 50} It is not reasonable to conclude from the contract language that the ten-day notice provision in Article 8 is tied to the end date of construction. The court's ruling tacitly indicates the court's belief that the "occurrence of the event giving rise to the claim" must have been the underlying on the job issues Accurate experienced while construction was ongoing. The contract language and the evidence do not support such an interpretation.

{¶ 51} For example, Purtee and Palmer admitted that a contractor's initial request for a change order does not amount to the submission of an Article 8 claim. Purtee also stated that a request for a change order would only turn into a claim if the contractor pursued Article 8. Purtee testified as follows:

> Q. And generally you pursue Article 8 if there's disagreement on the change order?
>
> A. Generally.
>
> Q. So a contractor doesn't have to assert a claim the first time it raises an issue on the project?
>
> A. No.

(Purtee Depo. at 248-49.)

{¶ 52} When a contractor experiences an issue on the job, the contract provides a method by which the contractor can attempt to remedy the issue. The contractor may submit a request for a change order pursuant to Article 7.2.3, by submitting written notice to the construction manager accompanied by a proposal meeting the requirements of Article 7.2.1. The proposal should detail any adjustment to the contract sum and any adjustment to the contract time.

{¶ 53} If the Management Team grants the contractor's change order request, arguably no event has occurred giving rise to a claim. The contractor had an issue, but the Management Team resolved the issue by granting the contractor's change order request. Depending on the nature of the claim and the particular contractual provisions at issue, the Management Team's denial of the contractor's change order request may be considered an event that has occurred giving rise to a claim.[3]

{¶ 54} We note that Article 8.1.2 identifies certain definite dates which commence the ten-day notice period. Article 8.1.2.1 provides the ten-day period does not commence until the University issues its determination on the adjustment to the contract sum and/or contract time resulting from a field work order.  Articles 8.1.2.2 and 8.1.2.3 both provide that the ten-day notice period does not commence until the architect issues a determination on a request for information ("RFI") or a differing site condition issue.[4] Thus, Article 8.1.2 indicates that some amount of official decision-making is necessary to signal to a contractor that the ten-day notice period has commenced.

{¶ 55} Accurate asserts the same event gave rise to each of the individual claims asserted in the January 3, 2014 claim letter, the December 24, 2013 rejection of its change order request. Based on this assertion, Accurate claims its January 3, 2014 notice of an Article 8 claim was therefore timely. Accurate's position is that the January 3, 2014 claim letter represents a single indivisible claim based on the denial of its December 24, 2013 change order request. In our view, Accurate's position is based on an overly simplistic interpretation of the contract language.

{¶ 56} The contract cannot be reasonably interpreted as permitting Accurate to bundle all of the individual claims that may have accrued during the Project into a single change order request and then give "timely" notice of those individual claims simply by submitting a claim letter within ten days of the denial of the change order.  If the contract were so interpreted, the language of Article 8.1 requiring the contractor to initiate every claim by giving written notice of the claim to Schooley and the University, through Smoot,

---

[3] Article 7.6 sets forth the contractor's reciprocal obligations with respect to "[c]hange order cost and credit determinations."

[4] If the contractor disagrees with the contracting authority's determination, Article 7.2.3 permits the contractor to request a change order "by submitting written notice to the [architect] through the [construction manager], accompanied by a Proposal meeting the requirements of subparagraph 7.2.1." Article 7.2.3.1. Under such circumstances, the event giving rise to the claim would occur at a later date.

within ten days after occurrence of the event giving rise to the claim, would have no practical meaning.

{¶ 57} Nevertheless, we hold that the Court of Claims committed reversible error by failing to analyze each of the individual claims asserted in the January 3, 2014 claim letter to determine the date when an event giving rise to the claim may have occurred. In light of the relevant contract language, arguments and evidence submitted by counsel, we find the Court of Claims erred in granting summary judgment. The Court of Claims must interpret the relevant contract language, in the first instance on remand, as it reviews the individual claims.  For this reason we need not address the alleged ambiguity raised by Accurate.

{¶ 58} For the foregoing reasons, we sustain Accurate's first assignment of error.

{¶ 59} Accurate's second assignment of error asserts the Court of Claims erred in granting the University's motion for summary judgment as the record presents genuine issues of material fact regarding the University's waiver of the Article 8 notice requirements. We agree.

{¶ 60} As applied to contracts, waiver is a voluntary relinquishment of a known right. *State ex rel. Wallace v. State Med. Bd. of Ohio*, 89 Ohio St.3d 431, 435 (2000). "Waiver assumes one has an opportunity to choose between either relinquishing or enforcing of the right." *Chubb v. Ohio Bur. of Workers' Comp.*, 81 Ohio St.3d 275, 279 (1998). A party who has a duty to perform and who changes its position as a result of the waiver may enforce the waiver. *Id.* at 279, citing *Andrews v. State Teachers Retirement Sys. Bd.*, 62 Ohio St.2d 202, 205 (1980). The party asserting waiver must prove the waiving party's clear, unequivocal, decisive act. *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 167 Ohio App.3d 685, 2006-Ohio-3492, ¶ 28 (8th Dist.)

{¶ 61} " '[W]aiver of a contract provision may be express or implied.' " *Lewis & Michael Moving & Storage, Inc. v. Stofcheck Ambulance Serv., Inc.*, 10th Dist. No. 05AP-662, 2006-Ohio-3810, ¶ 29, quoting *Natl. City Bank v. Rini*, 162 Ohio App.3d 662, 2005-Ohio-4041, ¶ 24. " ' "[W]aiver by estoppel" exists *when the acts and conduct of a party are inconsistent with an intent to claim a right*, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it.' " (Emphasis sic.) *Id.*, quoting *Natl. City Bank* at ¶ 24, quoting *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc.*, 156 Ohio App.3d 65, 2004-Ohio-411, ¶ 57. "Waiver by

estoppel allows a party's inconsistent conduct, rather than a party's intent, to establish a waiver of rights." *Id.*, quoting *Natl. City Bank* at ¶ 24.

{¶ 62} Whether a party's inconsistent conduct amounts to waiver involves a factual determination within the province of the trier of fact. *Id.* at ¶ 30, citing *Lamberjack v. Priesman*, 6th Dist. No. 92-OT-006 (Feb. 5, 1993), fn. 5; *Walker v. Holland*, 117 Ohio App.3d 775, 791 (2d Dist.1997). *Accord Bustillos v. Bell,* 3d Dist. No 5-11-44, 2012-Ohio-3320, ¶ 16 (noting that "waiver is usually a fact-driven issue"); *Synergy Mechanical Contrs. v. Kirk Williams Co., Inc.*, 10th Dist. No. 96APE06-826 (Jan. 30, 1997) (concluding that the trial court erred in granting summary judgment as there was a "genuine issue whether this document constitutes a waiver"). A public entity may waive provisions of a construction contract, such as the requirement of a written change order, " 'either in writing or by such clear and convincing evidence as to leave no reasonable doubt about it.' " *Mike McGarry & Sons, Inc. v. Constr. Resources One, LLC*, 6th Dist. No. S-17-005, 2018-Ohio-528, ¶ 103, quoting *Foster Wheeler Enviresponse v. Franklin Co. Convention Facilities Auth.*, 78 Ohio St.3d 353, 364 (1997).

{¶ 63} In *Aggressive Mechanical, Inc. v. Ohio School Facilities Comm.*, Ct. of Claims No. 2010-12745, 2012-Ohio-6332, the Court of Claims adopted a referee's decision finding that a public entity waived strict compliance with the Article 8 notice requirements. Due to delays on the construction project at issue in *Aggressive Mechanical*,[5] the construction manager issued construction bulletin 63 ("CB 63") extending the contract deadline. The plaintiff-contractor submitted a pricing proposal to the construction manager reflecting the increased costs the contractor would incur as a result of CB 63. Over several months, the manager rejected the contractor's first and second pricing proposals. In July 2009, the construction manager issued a proposed change order on the pricing issue which the contractor refused to sign.

{¶ 64} On July 30, 2009, the construction manager sent the contractor an e-mail stating the proposed change order would be deleted from the system, and the construction manager would "arrange to have a field level Article 8 meeting at [the construction manager's] office, just let me know when works for you." *Aggressive Mechanical* at ¶ 7. No correspondence between the parties concerning the pricing occurred again until November

---

[5] Remaining citations are to the referee's September 18, 2012 decision.

24, 2009, when the contractor sent the construction manager a letter requesting an Article 8 hearing. On December 16, 2009, the construction manager responded to the contractor's claim, advising the contractor to "follow the specific requirements set forth in GC Article 8." *Id.* at ¶ 9. However, the construction manager also informed the contractor that, "while the time constraints outlined [in Article 8 of the contract] have been grossly surpassed, the Construction Manager, the Architect and the Co-Ownership Team will consider your claim if properly documented and supported." *Id.*

{¶ 65} On these facts, the court concluded the construction manager had waived strict compliance with the Article 8 notice provision.[6] The court held that the construction manager's "conduct as shown in the July 30 and December 16, 2009 correspondence [was] inconsistent with an intent to claim strict compliance with the 10-day notice requirement in Article 8." *Id.* at ¶ 25. The court further concluded that "the parties engaged in the Article 8 field level process in an effort to compromise the CB 63 claim." *Id. See also J & H Reinforcing & Structural Erectors, Inc. v. Ohio School Facilities Comm.*, 10th Dist. No. 12AP-588, 2013-Ohio-3827, ¶ 87 (agreeing that the Ohio School Facilities Commission had "waived its right to strict compliance with the notice requirements of Articles 6 and 8 with regard to the post-CO 29 claims due to its own failure to comply with Article 8"); *Transamerica Bldg. Co., Inc., v. Ohio School Facilities Comm.*, Ct. of Claims No. 2013-00349 (Sept. 17, 2015)[7] (stating the referee was "convinced that by withholding the revised drawings from [the contractor], disregarding its obligations under Article 8 and waiving the Article 8 procedures for other contractors on the Dorm Project, OSFC, through the authorized acts of its agent LL, knowingly and impliedly waived strict compliance with the initiation, certification and submission requirements of GC 8.1, GC 8.2, GC 8.3, GC 8.4 and GC 8.5").

{¶ 66} Accurate asserts the University waived its right to strict compliance with the Article 8 notice provisions with regard to all of the individual claims set forth in the January 3, 2014 claim letter, based on its conduct toward other contractors' Article 8 claims, and by its conduct toward Accurate on Accurate's BP7 and BP8 claims. Pursuant to

---

[6] The Article 8 provision at issue in *Aggressive Mechanical* stated that any request "for equitable adjustment" should be made in writing and filed "no more than ten (10) days after the initial occurrence of the facts which are the basis of the claim." *Id.* at ¶ 25, fn. 5.

[7] Citation is to the referee's decision; the parties settled the case after the referee issued its decision but before the Court of Claims acted on the referee's decision.

our de novo review, we will examine the evidence Accurate produced in response to summary judgment.

{¶ 67} Purtee testified that she "always tried to resolve anything at the field level." (Purtee Depo. at 258.) Purtee explained that a field level resolution was "at the level of what we call the field. The contractor, the [construction manager], and the OSU staff try to resolve it without going any further to Article 8, trying to resolve the request for compensation, reach an agreement." (Purtee Depo. at 244.) Although Purtee acknowledged the contract does not provide for a field level resolution, she stated "[i]t's just that if we have a request for compensation we always try to resolve it right then and there so there's no reason for it to escalate." (Purtee Depo. at 244.)

{¶ 68} Palmer similarly affirmed that the "preferred method of doing things" was a "field level resolution" where the parties got "together and tr[ied] to work out a resolution rather than claims being asserted and letters flying back and forth." (Palmer Depo. at 208.) Palmer noted that trying to work things out at the field level was "an everyday occurrence." (Palmer Depo. at 194.)

{¶ 69} Accurate presented evidence regarding the Management Team's handling of Article 8 claims from three other contractors on the Project: Ohio Ceilings & Partitions ("OCP"), Hemm's Glass Shop ("Hemm's"), and TP Mechanical ("TP").

{¶ 70} OCP sent Smoot an e-mail on November 16, 2011 requesting a change order for additional compensation. On November 21, 2011, Smoot informed OCP it was rejecting their request for additional compensation. Palmer indicated that OCP had ten days from the November 21, 2011 rejection of its change order request in which to file an Article 8 claim.

{¶ 71} On December 2, 2011, OCP sent Smoot an e-mail indicating that OCP was filing an Article 8 claim regarding their request for additional compensation. Palmer responded to OCP's e-mail stating Smoot would "accept this as notice as long as you follow up in writing specifically following the requirements of Article 8 of the General Conditions of the contract documents." (Ex. 1012.) Palmer affirmed the December 2, 2011 e-mail was beyond the Article 8 ten-day notice period, and affirmed that by accepting the December 2, 2011 notice he was "not strictly enforcing the Article 8 requirements." (Palmer Depo. at 71.) Purtee also noted that, while OCP had failed to strictly comply with the submission

requirements of Article 8, the University generally "tr[ied] to give the contractors ample opportunity to provide us with the documents that we need." (Purtee Depo. at 75.)

{¶ 72} On December 12, 2011, Palmer sent OCP an e-mail stating that, although he had not "received any formal mailing of the dispute," he would like for OCP to provide "several dates and times that they can be available to meet to try and bring this issue to resolution." (Ex. 1017.) Palmer affirmed that the meeting he proposed would be a "field resolution meeting." (Palmer Depo. at 76.) Purtee admitted she did not recall indicating that OCP's claim should have been rejected based on their failure to comply with Article 8.

{¶ 73} Hemm's sent an e-mail to Smoot on December 20, 2011 indicating that based on an RFI response it received it would have to install different materials than it originally believed necessary. Smoot responded stating that if Hemm's "believe[d] that [it was] owed additional costs for this, please follow the procedures outlined under Article 8 of the General Conditions." (Ex. 1106.) On December 28, 2011, Hemm's e-mailed Smoot stating that it was interested in making an Article 8 claim. On January 3, 2012, Smoot responded stating that Hemm's must "get the letter sent in within the specified time frame (10 days?)" and "[a]ddress the five items listed in Para 8.1.3[8] to the best of your ability." (Ex. 1106.) Hemm's submitted its Article 8 claim on January 3, 2012.

{¶ 74} Palmer affirmed that, by January 3, 2012, he believed "the ten-day period had expired" on Hemm's claim. (Palmer Depo. at 79.) Nevertheless, Palmer had no recollection of telling Hemm's that their Article 8 claim was untimely.

{¶ 75} TP initially sent Smoot a cost proposal on February 3, 2012 requesting additional compensation. Shortly thereafter, Smoot denied TP's request for additional compensation. Several months later, on July 14, 2012, TP sent a letter to Palmer indicating it was seeking Article 8 review of its request for additional compensation.

{¶ 76} Palmer responded to TP's July 14 letter on July 24, 2012, stating that TP's "notice of intent to dispute does not follow the indicated guidelines as outlined in Article 8.1.3 of the General Conditions of the Contract Documents. Additionally, this dispute can

---

[8] Article 8.1.3 provides that a contractor's written notice of a claim must provide the following information: nature and anticipated amount of impact; identification of the circumstances responsible for causing the impact; identification of the activities on the schedule which will be affected; anticipated impacts; and recommended action to avoid or minimize any interference, disruption, hindrance, delay or impact.

be rejected solely for not complying with Article 8.1.2 of this same section." (Ex. 1047.) However, Palmer further informed TP that:

> In the interest of being fair and reasonable and to move forward, this submitted claim needs to fulfill all aspects of the requirements of Article 8.1.3 and be submitted with all relevant information to allow the project team to properly review and evaluate the claim.
>
> Upon receipt of the above information, we will continue the review process as outlined in the Article 8 process.

(Ex. 1047.)

{¶ 77} Purtee acknowledged that TP had failed to comply with the requirements of Article 8 and admitted that she never told Smoot to deny TP's claims based on the Article 8 deficiencies. Purtee agreed with Palmer's indication that the Management Team would be fair and reasonable, noting "we were trying to be fair and reasonable. We understand that it takes time to pull together documentation according to the Article 8 sections. We tried to be accommodating." (Purtee Depo. at 182.)

{¶ 78} Accurate experienced delays throughout its work on BP7. On March 31, 2012, Bob Beal, the president of Accurate, sent Palmer a letter stating that Accurate was projecting its "cost for completion of [BP7] and unfortunately we are projecting a 15,000 hour over loss of productivity." (Ex. 1026.) Beal informed Palmer that Accurate was seeking $478,305 in additional compensation based on the BP7 delays, and attached a proposed change order reflecting the request for additional compensation to the letter. Palmer acknowledged the events giving rise to Accurate's March 31, 2012 claim for additional compensation concerned events which occurred throughout 2011 and 2012.

{¶ 79} Palmer forwarded Accurate's March 31, 2012 proposed change order to Purtee. Purtee responded stating, "I agree that we did create some of the issues. OCP created some of the issues as well." (Ex. 1027.) On April 2, 2012, Purtee established a potential change order for the entire amount of the additional compensation identified in Accurate's March 31, 2012 letter.

{¶ 80} On May 28, 2012, Accurate wrote a letter to Smoot "follow[ing] up from our meeting in April with the owner regarding our change order request." (Ex. 1037.) Accurate indicated it had revised the amount of additional compensation it was seeking to

$477,829.41. Following the May 28, 2012 letter, nothing substantively happened between the parties on Accurate's BP7 claims for several months.

{¶ 81} In a December 5, 2012 letter, Accurate noted that Smoot still had yet to act on Accurate's BP7 claims. At a December 12, 2012 meeting, the Management Team concluded that Palmer should "set up meeting with Bob Beal and Tony as it relates to Accurate Article 8." (Ex. 1048.) Palmer and Evans communicated about the BP7 claims via e-mail and, on January 8, 2013, Evans sent Palmer a revised proposed change order indicating that Accurate was now requesting $456,812.35 in additional compensation.

{¶ 82} On January 24, 2013, the parties had a field level resolution meeting regarding Accurate's BP7 claims. The parties agreed to resolve Accurate's BP7 claims for $202,657.95. On January 25, 2013, Purtee informed some University officials there had been a "[f]ield level resolution for Accurate. [Change Orders] will be issued on each item." (Ex. 1055.) Although Smoot had Evans sign change orders reflecting the results of the January 24, 2013 meeting which stated "Justification: Article 8 Resolution," a few weeks later, a Smoot employee altered the change orders to state "Justification: Compensation Resolution." (Exs. 1056; 1058.) Purtee could not recall if she directed the Smoot employee to alter the change orders.

{¶ 83} Throughout the nearly year-long proceedings on Accurate's BP7 claims, the Management Team never informed Accurate it had waived its claims by failing to comply with the Article 8 notice requirements. Palmer stated that Accurate's BP7 "work was so comingled with impacts by every contractor, that we ended up -- even with Accurate, sat down with him and negotiated a resolution. So to go to the notice discussion, no, I don't think there was a response to tell them." (Palmer Depo. at 122.) Palmer testified as follows:

> Q. Accurate's Article 8 claim in Bid Package 7 wasn't strictly compliant with the Article 8 notice provision, was it?
>
> A. No, nor were quite a few there.

(Palmer Depo. at 200.)

{¶ 84} Regarding BP8, Accurate initially informed Smoot it was experiencing impacts and delays to its BP8 work in December 2012. In response, Palmer suggested the parties meet and discuss the issues.

{¶ 85} On February 27, 2013, Evans sent an e-mail to Palmer stating that Accurate "disagree[d] with the Means[9] pricing on our change order pricing." (Ex. 1084.) Evans informed Palmer that the change orders in question on the pricing issue were change orders 612, ASI, 042, 682, 683, 693, 416, 622, and 587. Evans stated that Accurate would "like to set up another meeting to try to resolve these pricing issues, would you like Accurate Electric [to] file for an Article 8 or do you want us to submit an Alternative Dispute Resolution? * * * Please let us know on how you want us to move forward." (Ex. 1084.)

{¶ 86} Purtee testified she did not recall if anyone responded to Accurate's question in the February 27, 2013 e-mail about filing an Article 8 claim, but stated "there were several meetings between Accurate and Smoot on the disputed change orders." (Purtee Depo. at 281.) The parties did not reach an agreement on the pricing issue. The University imposed its pricing and processed the following change orders unilaterally: 416, 662, 682, 683, 693, 503R1, 612A, and 612B.

{¶ 87} On March 4, 2013, Evans sent Palmer a letter noting that many of the predecessor activities to Accurate's BP8 work were falling behind schedule. Accurate noted these delays would "force Accurate Electric to work longer" and to "keep tools, equipment, supervision and manpower on the project longer than planned." (Ex. 1076.)

{¶ 88} On March 8, 2013, Purtee wrote an e-mail to other University officials regarding Accurate's March 4, 2013 "delay notice." (Ex. 1077.) Purtee stated the "delay issue [would] likely move thru the Article 8 process," and noted that the Management Team was "processing several [change orders] unilaterally. Accurate refuses to have their [change order] pricing modified by MEANS or any other method and demands full payment. This issue will likely move on thru the Article 8 process." (Ex. 1077.)

{¶ 89} On March 14, 2013, Palmer responded to Evans' March 4, 2013 letter asserting Accurate had contributed to the delays. Palmer further indicated that Accurate "never provided proper notification until the March 4, 2013 correspondence and to that end have lost their rights against reported impacts/delays prior to ten days before this notification." (Ex. 1073.) However, Purtee affirmed that, following Accurate's March 4,

---

[9] "Means" or "RSMeans" is a "national publication to document the cost of construction that is indexed to cities around the United States." (Palmer Depo. at 177.) Thus, Means pricing "is a process of evaluating change orders." (Purtee Depo. at 279.)

2013 delay letter, the parties had "some meetings to discuss trying to get those things resolved at the field level." (Purtee Depo. at 290.)

{¶ 90} On March 5, 2013, Beal sent Palmer an e-mail asking that Palmer rescind the January 21, 2013 notice to comply on the flexible conduit issue. Beal stated that if Palmer wanted to pursue the flexible conduit issue "consider this a request for mediation as called for in Article 8.11.4.2[10] alternative dispute resolution and we also request ADR mediation on [Smoot's] decision to cut our change order labor hours expensed and unilaterally executing change orders." (Ex. 1061.)

{¶ 91} On March 12, 2013, Palmer wrote an e-mail to Beal stating the disposition of the flexible conduit issue would likely "be in the format of issuing a unilateral deductive change order for not complying with the documents. Accurate may follow the dispute proceedings for resolving this outcome should they choose to follow this path." (Ex. 1062.) Palmer also informed Beal that his "request of pursuit of mediation or ADR will not be followed, at least at this point in time, as is stipulated in Article 8.10.6.[11] Accurate is requested to follow specifically those requirements as outlined under Articles 8.1.2 and 8.1.3 for all such disputes that they intend to pursue." (Ex. 1062.) Regarding Palmer's March 12, 2013 e-mail, Purtee stated that the Management Team was "following the process in trying to do a field level resolution, and [she did not] recall ever directing Smoot to not follow mediation or ADR." (Purtee Depo. at 232-33.)

{¶ 92} At the March and April meetings of the Management Team, the meeting minutes note that Accurate's BP8 issues would likely turn into Article 8 claims. On June 10, 2013, Palmer e-mailed Evans about a number of issues outstanding between the parties, including display graphic panel work, fire alarm pricing resolution, the milestone dates change order, the flexible conduit resolution, and the 12th Avenue conduit crossing.

{¶ 93} By October 9, 2013, the Management Team concluded "[t]here [were] several issues with Accurate, we need to have a meeting." (Ex. 1087.) A meeting between the parties was scheduled for October 16, 2013.

---

[10] Providing for mediation as an alternative dispute resolution method.
[11] Providing that any "claim remaining unresolved after completion of the [Article 8] process * * * shall be subject to litigation, which may be preceded by Alternative Dispute Resolution." (General Conditions, 8.10.6.)

{¶ 94} On October 11, 2013, Evans e-mailed Smoot a copy of "the agenda for the meeting." (Ex. 1088.) Evans stated that Accurate "wishe[d] to resolve disputed problems/unpaid changes and impacts to our contract." (Ex. 1088.) Accurate's agenda listed several items, including change order 363 regarding the milestone dates.

{¶ 95} On October 14, 2013, a Smoot employee e-mailed Evans the following list of the official meeting agenda for the October 16, 2013 meeting:

> 255 Pre Action System
> 632 Resident Room Data & Light [F]ixtures
> 633 Door Position Graphics Display Panels
> RFI #1725
> 699R1 Fuel Oil Fill Revision
> Repair Site Lighting Damaged by Others
> Add LED Lights to Display Panels
> Meters TCP/Ethernet
> Flex Conduit
> Fire Alarm Allowance
> Blank-off Plate Allowance
> Site Lighting Circuit Phasing
> Watermain Event Balance Billing

(Ex. 1089.)

{¶ 96} Evans responded on October 15, 2013 asking "[w]as there some reason you left out several items from our agenda that wasn't added to your official meeting agenda." (Ex. 1090.) Palmer responded to Evans that same day stating "[y]es we will respond or meet to those items that you have presented as topics of discussion separately." (Ex. 1090.)

{¶ 97} Palmer affirmed that the October 16, 2013 meeting was "a field resolution meeting like the ones we talked about for Bid Package 7." (Palmer Depo. at 213.) Purtee described the October 16, 2013 meeting as follows:

> Q. This October meeting was a meeting, though, to try to field
> resolve these issues, though, right?
>
> A. Yes, that was the intent.
>
> Q. And it wasn't about making a claim? It was just to – let's see
> if we can resolve it like you had been doing?
>
> A. Yes, I believe so.

(Purtee Depo. at 302.)

{¶ 98} At the October 16, 2013 meeting, the parties resolved some issues but were unable to resolve others. The meeting minutes state under the section "closing" that "[s]ome of the items Accurate needs to provide additional information. Some of the items Accurate knows what Smoot and Heapy's position is so if they are still in dispute they should follow contract guidelines." (Ex. 1091.) Palmer stated that, as a result of the October 16, 2013 meeting, Smoot was expecting "[a]dditional information, for sure," from Accurate, and was "speculative on the claim." (Palmer Depo. at 214.) Purtee affirmed that as a result of the October 16, 2013 meeting, "there was talk about providing additional information." (Purtee Depo. at 304.)

{¶ 99} Following the October 16, 2013 meeting, the Management Team established a potential change order relative to Accurate's BP8 claims in the amount of $500,000. In an October 18, 2013 e-mail, Purtee informed a University official that, as a result of the October 16, 2013 meeting, Accurate was directed to "go back and provide all the back-up information necessary to substantiate with request, most of which we want to pay them for their work since they are due payment. The other large request for compensation was not discussed." (Ex. 1093.) Purtee explained that the "other large request for compensation" referred to the delay issues and the milestone dates. (Purtee Depo. at 309-11.)

{¶ 100} On October 21, 2013, Beal sent an e-mail to several individuals from the University and Smoot. Beal addressed the issues discussed at the October 16, 2013 meeting, and further stated as follows:

> On October 11, 2013 [Accurate] provided [the Management Team] an agenda of items that also included, Manipulation of milestone change orders, Viking Phones, Best Locks, Exterior Cleaning, 12th Ave crossing, Technology conduit fill, Conduit to cable tray, & CM's misuse of R.S. Means, that have been yet to be addressed by the "Team" totaling $2,125,171.49 * * *. At the end of Wednesday's meeting Greg Palmer advised that I should go by the contract for the next step to resolve and I am requesting "The Team" take this to your higher ups at and seek better plan. It's our desire to make one last attempt * * *. This work was authorized by you and performed by Accurate Electric and the owner is currently benefiting from it.

(Ex. at 1094.)

{¶ 101} Regarding Beal's statement that he wanted to make "one last attempt," Purtee testified as follows:

> Q. Did you take that to mean that Accurate was still wanting to talk about this and trying to make an attempt to resolve things at the field level as it relates to their other items?
>
> A. That's what it says in this e-mail.
>
> Q. So he was asking for future consideration as to those items as of this date?
>
> A. That's what it appears to state, yes.
>
> Q. Did you agree with that?
>
> A. We didn't disagree. We didn't say they couldn't or that we would not continue discussions.
>
> Q. Well, you did continue, though, to consider some of these as the time progressed; did you not?
>
> A. As far as I can recall, yes.

(Purtee Depo. at 314-15.)

{¶ 102} On October 24, 2013, Palmer responded to Beal's October 21, 2013 e-mail stating that, as the e-mail was "not part of the Article 8 process and makes general, unsupported statements," Palmer would not respond to it. (Ex. 1121.) Palmer further stated the University's decision to reach an equitable resolution on some of the issues at the October 16, 2013 meeting was "not a waiver of its right to enforce the Contract. To the extent [Accurate] has failed to provide notice of any claim in compliance with Article 8, such claim is irrevocably waived per General Conditions Article 8.1.4." (Ex. 1121.)

{¶ 103} In November 2013, the University continued to hold the potential change order of $500,000 for Accurate's BP8 claims. In a November 5, 2013 e-mail, Purtee asked a Smoot employee to send her information about Accurate's BP8 claims. The Smoot employee responded, providing Purtee with some information. On November 13, 2013, Purtee wrote back to the Smoot employee stating "[w]hat about those other items that Accurate referred to * * * Viking phones, Best Locks, Additional beams, technology conduit

fill, exterior cleaning." (Ex. 1099.) Purtee stated as follows regarding this time period in November 2013:

> Q. Okay. Were you still willing to try to work towards a field resolution to all those issues with Accurate?
>
> A. I don't know why I would not have been.

(Purtee Depo. at 324.)

{¶ 104} When communications broke down between the parties, Accurate filed its December 23, 2013 request for a change order on the remaining BP8 issues. Through the Article 8 process, the University paid some of Accurate's BP8 claims.

{¶ 105} In light of the evidence presented, and considering that waiver is a fact-driven issue, we conclude the record presents genuine issues of material fact regarding whether the University waived its right to strict compliance with the Article 8 notice requirements with regard to some or all of the individual claims asserted in the January 3, 2014 claim letter. The evidence demonstrates the University's preferred method of resolving contractor claims was pursuant to informal field level resolutions. The University ignored the Article 8 notice requirements for claims made by OCP, Hemm's, and TP, and similarly ignored the Article 8 notice requirements for Accurate's BP7 claims. Such conduct by the University demonstrated an intent to work with contractors to resolve their claims outside the Article 8 process. Indeed, Purtee testified she tried to resolve things at the field level to specifically avoid the Article 8 process.

{¶ 106} The evidence permits the inference that the University, by endeavoring to resolve individual claims at the field level and outside of the Article 8 process, may have misled Accurate, to its prejudice, into believing that the University would similarly act to resolve Accurate's BP8 claims exclusively through field level resolutions. Indeed, the University held a field level resolution to address some of Accurate's BP8 claims on October 16, 2013.

{¶ 107} Although Palmer at various points throughout BP8 referred Accurate to Article 8, the evidence permits an inference that the University's continued indication that it would resolve issues at the field level may have compromised Accurate's ability to file a timely Article 8 claim. For instance, although Palmer directed Accurate to follow the Article 8 procedures regarding the flexible conduit issue in a March 12, 2013 e-mail, Palmer

continued to address the flexible conduit in a June 10, 2013 e-mail, and the flexible conduit was an agenda item the parties addressed at the October 16, 2013 field level resolution meeting.

{¶ 108} Similarly, on February 27, 2013, Accurate asked Smoot if it should file an Article 8 claim on the pricing issue regarding its change orders. Instead of responding to the question about filing an Article 8 claim, Smoot had meetings with Accurate regarding the pricing issues. Although Accurate indicated it wanted to discuss the milestone dates at the October 16, 2013 field level resolution meeting, Palmer informed Evans that the parties would have a separate meeting on the milestone issue. Thus, in October 2013, rather than indicating that Accurate needed to file an Article 8 claim on the milestone dates or informing Accurate that it had missed the deadline to do so, the University indicated to Accurate it was willing to have another meeting to discuss the milestone dates. Purtee testified she remained willing to work toward a field level resolution of Accurate's BP8 issues even into November 2013. Accordingly, Accurate presented some evidence from which reasonable minds could conclude that the University waived its right to demand strict compliance with the Article 8 notice provisions with respect to some or all of the claims asserted in the January 3, 2014 claim letter.

{¶ 109} On this record, the question whether Accurate has established, by clear and convincing evidence, the University's waiver of the Article 8 notice provisions as to any of the individual claims asserted in the January 3, 2014 claim letter is a question that must be resolved at trial and not in these summary judgment proceedings. Because the record presents genuine issues of material fact regarding the University's waiver of the Article 8 notice provisions, summary judgment was inappropriate.

{¶ 110} Accurate's second assignment of error is sustained.

{¶ 111} Accurate's third assignment of error asserts the Court of Claims erred in granting the University's motion for summary judgment on the undisputed contract balance.

{¶ 112} Accurate explains it is not seeking to obtain its final payment under the contract but, rather, seeks only to obtain the undisputed contract balance of $304,514.13 which is not related to the claims at issue in the present case. Accurate notes that once the instant case is concluded, it will then "submit a final payment application for the

determined amount with all of the required closeout documentation." (Appellant's Brief at 49.)

{¶ 113} In its complaint, Accurate alleged that it sought payment for its "outstanding contract balance" and for an "amount due under the contract." (Compl. at ¶ 31, 35(k).) Accurate never stated it was seeking the final contract balance or the retainage amount. In moving for summary judgment, the University asserted Accurate was not entitled to release of the final contract balance or retainage amount because Accurate had not completed the required close-out documents. The Court of Claims determined the University was entitled to summary judgment on the contract balance issue because Accurate never submitted the necessary close-out documents.

{¶ 114} Thus, our review of the record demonstrates that Accurate never sought to obtain its final contract balance or retainage amount. Rather, Accurate has only sought to obtain the undisputed portion of the contract balance which is not related to the claims pending in the present case.

{¶ 115} Article 8.14.2 of the contract provides that the "Contracting Authority shall continue to make payment of any undisputed amounts in accordance with the Contract Documents pending final resolution of a claim, unless otherwise agreed by the Contractor and the Contracting Authority in writing." There is nothing in the record indicating the parties have "otherwise agreed" pursuant to Article 8.14.2. Accordingly, the University must make payment to Accurate of any undisputed amounts in accordance with the contract documents pending final resolution of the claims at issue in the instant case. The Court of Claims erred in granting the University's motion for summary judgement on the unpaid contract balance.

{¶ 116} Accurate's third assignment of error is sustained.

{¶ 117} Accurate's fourth assignment of error asserts the Court of Claims erred in granting the University leave to file a reply brief and in denying Accurate leave to file a surreply brief. At the time of these proceedings, Court of Claims Local Rule 4(C)[12] provided a "[r]eply brief or additional briefs may be filed only upon a showing of necessity therefore and with leave of court." Accordingly, it was within the Court of Claims discretion to permit

---

[12] Loc.R. 4(C) was amended effective July 1, 2019. The rule now provides that "[r]eply briefs may be served within seven days after service of the response to the motion. Additional briefs may be filed only upon a showing of the necessity therefore and with leave of court."

the parties to file either a reply brief or a surreply brief. *First Fin. Servs., Inc. v. Cross Tabernacle Deliverance Church, Inc.*, 10th Dist. No. 06AP-404, 2007-Ohio-4274, ¶ 39; *Bates v. Midland Title of Ashtabula Cty., Inc.*, 11th Dist. No. 2003-L-127, 2004-Ohio-6325, ¶ 34.

{¶ 118} In moving for leave, the University argued that Accurate had omitted relevant provisions of the contract from its memorandum in opposition to summary judgment. Specifically, the University asserted that Accurate failed to mention Articles 7.1.2 and 7.1.2.1 of the contract. We find no abuse of discretion in the court's decision to grant the University leave to file a reply brief.

{¶ 119} Accurate asserts the Court of Claims should have allowed it to file a surreply brief because the University raised new arguments in its reply brief. However, Accurate fails to identify what new arguments the University allegedly raised in its reply brief. Our review of the reply brief demonstrates the University did not raise new arguments. Rather, the University reiterated its summary judgment arguments and responded to the arguments Accurate made in opposition to summary judgment. As such, the Court of Claims did not abuse its discretion in denying Accurate's request to file a surreply brief.

{¶ 120} Accurate's fourth assignment of error is overruled.

{¶ 121} Accurate's fifth assignment of error asserts the Court of Claims erred in granting the University summary judgment on Counts 3 and 4 of the complaint because the University failed to meet its initial summary judgment burden with respect to these counts. The party seeking summary judgment bears the initial burden of informing the court of the basis for the motion and identifying portions of the record that demonstrate no genuine issue of material fact remain as to the essential elements of the non-moving party's claim. *Dresher* at 293.

{¶ 122} Accurate notes that, in the University's March 1, 2016 motion for summary judgment, the University simply asserted that Accurate could not prove its claims under Counts 3 and 4 of the complaint. The Court of Claims, however, did not grant the University summary judgment on Counts 3 and 4 based on the arguments contained in the University's initial summary judgment motion. Instead, the referee sought and the parties produced additional briefing on these counts.

{¶ 123} The University supported its September 2, 2016 brief in response to the referee's request for additional briefing with Beal's deposition testimony and the affidavit of the University Director of Projects, Scott Conlon. The University asserted that Beal's testimony demonstrated Accurate was not able to identify any actual warranties it claimed the University had breached, and that Accurate's breach of warranties claim was substantively a breach of contract claim. Conlon's affidavit incorporated by reference the contract between the University and Accurate. Article 4.1 of the contract provided that the "Contract Documents embody the entire understanding of the parties and form the basis of the Contract between the Contracting Authority and the Contractor." (University's Brief in Response to Recommendation of Referee, Conlon Aff. Ex. 1.) Based on this contract provision, the University asserted there could be no implied warranties as the parties' contract constituted the entire agreement between the parties. The University asserted that Accurate's breach of the duty of good faith and fair dealing claim failed as a matter of law, and cited case law to support its legal argument.

{¶ 124} The University satisfied its initial summary judgment burden with respect to Counts 3 and 4 of the complaint by informing the court of the basis for its motion. The University identified Beal's deposition testimony and Conlon's affidavit as portions of the record which demonstrated there were no genuine issues of material fact on Accurate's breach of warranties claim, and directed the court to case law supporting its contention that it was entitled to summary judgment on the breach of the duty of good faith and fair dealing claim.

{¶ 125} Based on the foregoing, Accurate's fifth assignment of error is overruled.

{¶ 126} Accurate' sixth assignment of error asserts the Court of Claims erred in granting the University summary judgment on Counts 3 and 4 of the complaint because Accurate presented substantial evidence in support of these counts.

{¶ 127} In response to the referee's request for additional briefing, Accurate asserted that the "warranty at issue in Count III is the University's implied warranty to provide Accurate with a site upon which Accurate could perform its work without hindrance, interference, or delay." (Accurate's Memo in Support of Counts III and IV of its Compl. at 3-4.) Accurate also asserted the University breached an implied warranty to provide Accurate with additional compensation by unilaterally processing change order 363 as a

zero cost change order, and asserted the University breached an implied warranty to promote teamwork, cooperation, and respect among the contractors by failing to develop the partnering agreement described in Article 4.4.3[13] of the contract.

{¶ 128}  "There can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself." *Hamilton Ins. Servs. Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 274 (1999), citing *Kachelmacher v. Laird*, 92 Ohio St. 324 (1915), paragraph one of the syllabus. The parties' agreement contained an integration clause stating that the contract was "the entire understanding of the parties." (Conlon Aff., Ex. 1.) *See McGrath v. Nationwide Mut. Ins. Co.*, 295 F.Supp.3d 796, 808 (S.D.Ohio.2018) (noting the principle that there can be no implied covenants in a contract in relation to any matter specifically covered in the contract "is especially true in the presence of an integration clause"). Because the implied warranties identified by Accurate relate to matters specifically covered by the parties' written agreement, the University was entitled to judgment on the implied warranties claim, as a matter of law.  *Hamilton*; *Kachelmacher.*

{¶ 129} In response to the referee's request for additional briefing, Accurate asserted the University breached its duty of good faith and fair dealing in the following ways: failing to develop the partnering agreement under Article 4.4.3; issuing unilaterally processed change orders; informing contractors there would be no extension to the contract end date; negotiating Accurate's BP7 claims in bad faith; arbitrarily treating Accurate's BP8 claims differently from Accurate's BP7 claims; and by threatening Accurate with being blacklisted from future University projects.

{¶ 130} "[U]nder Ohio law, 'there is an implied duty of good faith and fair dealing in every contract.' " *CosmetiCredit, LLC v. World Fin. Network Natl. Bank*, 10th Dist. No. 14AP-32, 2014-Ohio-5301, ¶ 35, quoting *Am. Contrs. Indemn. Co. v. Nicole Gas Prod., Ltd.*, 10th Dist. No. 07AP-1039, 2008-Ohio-5056, ¶ 13. The implied duty to exercise good faith and fair dealing has been described as " '[a] compact reference to an implied undertaking

---

[13] Providing that "the Project's key stakeholders shall meet prior to the construction of the Project for developing a partnering agreement." (General Conditions, 4.4.3.) The partnering agreement would provide "a problem solution process, an Alternative Dispute Resolution ("ADR") strategy in accordance with paragraph 8.11, and an implementation plan for the partnering arrangement." (General Conditions, 4.4.3.) Purtee testified that she did not recall "on the South High Rise if there was partnering meetings" pursuant to Article 4.4.3 of the contract. (Purtee Depo. at 32.)

not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.' " *Natl./Rs, Inc. v. Huff*, 10th Dist. No. 10AP-306, 2010-Ohio-6530, ¶ 18, quoting *Ed Schory & Sons, Inc. v. Society Natl. Bank*, 75 Ohio St.3d 433, 443-44 (1996).

{¶ 131} However, "the covenant of good faith is part of a contract claim and does not stand alone as a separate cause of action from a breach of contract claim." *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. No. 04AP-980, 2006-Ohio-638, ¶ 98, citing *Lakota Local School Dist. Bd. of Edn. v. Brickner*, 108 Ohio App.3d 637, 646 (6th Dist.1996). Thus, "[a] claim for breach of contract subsumes the accompanying claim for breach of the duty of good faith and fair dealing." *Krukrubo v. Fifth Third Bank*, 10th Dist. No. 07AP-270, 2007-Ohio-7007, ¶ 19.

{¶ 132} The court concluded that, because Accurate could not maintain its breach of contract claim due to its failure to comply with Article 8, Accurate's breach of the duty of good faith and fair dealing claim had to be dismissed as well. In our ruling on Accurate's first and second assignments of error, we found genuine issues of material fact regarding the application of Article 8 to the present case. As such, we find the Court of Claims erred in granting the University's motion for summary judgment on Counts 3 and 4 of the complaint based on Article 8 of the contract.

{¶ 133} Based on the foregoing, we sustain Accurate's sixth assignment of error, in part, as to the claims for breach of the implied covenant of good faith and fair dealing, and we overrule Accurate's sixth assignment of error, in part, as to the implied warranties claim.

{¶ 134} In conclusion, we sustain Accurate's first, second, and third assignments of error, and sustain Accurate's sixth assignment of error, in part, and we overrule Accurate's fourth and fifth assignments of error and overrule Accurate's sixth assignment of error, in part. Accordingly, we affirm the judgment of the Court of Claims of Ohio, in part, and reverse, in part, and remand the matter for further proceedings consistent with this decision.

*Judgment affirmed in part and reversed in part; case remanded.*

SADLER, J., concurs.
BRUNNER, J., concurs in part and dissents in part.

BRUNNER, J., concurring in part and dissenting in part.

{¶ 135} Because I believe this Court should remand this matter to the Court of Claims of Ohio based on prejudice to Accurate Electric Construction, Inc. ("Accurate") according to App.R. 12(D), I concur with the decision of the majority in reversing the Court of Claims' decision, but I respectfully dissent from the majority opinion in that it addresses each of Accurate's assignments of error.

{¶ 136} The record is clear on de novo review and the arguments of the parties that Accurate and The Ohio State University ("University") are at odds as to one basic fact: the number of contracts that are at issue in this matter. Accurate has consistently maintained that this action concerns its claims for additional compensation for its performance of *two* construction contracts, Bid Package 7 ("BP7") and Bid Package 8 ("BP8"). The University, however, argues that all of Accurate's claims relate only to *one* contract, BP8, and that "any factual allegations regarding BP7 are irrelevant." (University's brief at 13.) The University's motion for summary judgment focuses exclusively on Accurate's contract and claims in connection with BP8, stating the following in footnote 1: "Please note that while Accurate tries to conflate Bid Packages 7 and 8, the Bid Package 7 Project involved Park and Stradley Halls and the connector between the two, while the Bid Package 8 Project involved Smith and Steeb Halls and the connector between those two buildings. Accurate also received the work for the standalone building, Siebert Hall." (Mar. 1, 2016 University's Mot. for Summ. Jgmt. at fn. 1.) Since the record is clear that reasonable minds could differ about the number of contracts at issue, this factual question should be resolved before appellate review so that the Court of Claims is able to determine whether a contractual breach has occurred such that either Accurate is entitled to damages on one or both contracts, or the University is entitled to summary judgment as to one or both contracts.

{¶ 137} It is incumbent on this Court to review independently the evidence in the record to determine whether genuine issues of any material facts exist that relate to whether this matter concerns claims raised in connection with two contracts, rather than just one, and for consequent damages or instructions to the parties. Construing the evidence in a light most favorable to Accurate, the nonmoving party (*see Wilkins v. Harrisburg*, 10th Dist. No. 14AP-1028, 2015-Ohio-5472, ¶ 7), there exists evidence creating

genuine issues of material fact about the number of contracts under which Accurate is asserting claims against the University.

{¶ 138} While this may be argued to elevate form over substance, the record establishes that it is undisputed that the Project was complex, comprised of separate, but interwoven, time-sensitive components. The parties agree the phases of the projects overlapped, such that an untimely completion of Phase 2 could impact Phase 3. (Palmer Dep. at 30.) As part of the factual scenario between the parties, they also agreed that failure to complete BP7 on time could impact on BP8. The record demonstrates that Accurate was still attempting to resolve issues and claims from work it performed under BP7 while it was performing work on BP8.

{¶ 139} De novo review of the record and the arguments of the parties show that the evidence provided for determining summary judgment to avoid a trial was in the form of deposition testimony and documents, which in and of themselves elicited material questions of fact. Taking into consideration all the testimony and documentary evidence and drawing all reasonable inferences in favor of Accurate, it is not possible to say that no genuine issue of material fact remains, even before examining Accurate's assignments of error. It is clear from the record that material issues of fact exist before addressing Accurate's assignments of error, because the Court of Claims did not determine the basic question of whether one or two contracts existed before stating as a matter of law that the University was entitled to summary judgment, based on the contractual language and the actions of the parties.

{¶ 140} I find that Accurate's assignments of error do not squarely permit this Court to sustain any of them, being colored by legal arguments other than the simple conclusion that material issues of fact remain that preclude summary judgment. I strongly hesitate as a reviewing court to find that the Court of Claims has tacitly adopted the University's argument that BP7 is irrelevant or that BP7 arguments are subsumed by those for BP8, because of the dependency of one on another, which I believe requires separate determination. Thus, I would moot all of Accurate's assignments of error, since our de novo review of the record of the Court of Claims makes it clear that the Court of Claims did not address the basic, disputed issue as to whether one or two contracts existed.

{¶ 141} I recognize that App.R. 12(A) requires that we address at least one assignment of error in reviewing a "trial court" decision. However, because the Court of Claims is not a typical "trial court" as contemplated in App.R. 12, I believe the catchall provision of App.R. 12(D)[14] permits us to reverse without addressing Accurate's assignments of error when we find on de novo review such basic error in the record that serves to moot all of them.

{¶ 142} Examining briefly the origin and nature of the Court of Claims, R.C. 2743.05 provides that "[e]xcept as stated in section 2743.63 of the Revised Code, the court of claims has the same powers to subpoena witnesses, require the production of evidence, and punish for contempt as the court of common pleas." But R.C. 2743.03(C)(1) provides that only a single judge or in "a civil action presenting novel or complex issues of law or fact" a panel of three judges, may be appointed to hear a civil action against the State. Here, as often occurs in the Court of Claims, Civ.R. 53 was invoked to essentially transfer the time-consuming complexities of this case to a magistrate. As sometimes occurs with the operation of Civ.R. 53, critical matters appear to have been "lost in translation," from magistrate decision to the Court of Claims' decision to entry of final judgment such that the basic determination of whether one or two contracts existed (one that permeates the record) was not addressed. There being no provision for a jury in claims against the State (here a state university, and one of many in the State), we are not the three-judge panel contemplated by R.C. 2743.03(C)(1) that could have thoroughly considered the issues before the Court of Claims.

{¶ 143} I would find that App.R. 12(A), with its direction concerning the "trial court," is not exclusive for appeals arising from the Court of Claims because of the distinct statutory underpinnings of the Court of Claims' origin and its inherent limitations and differences from a constitutionally created trial court of this State. There is no provision for the Court of Claims (of which there is only one in the State) for a typical "trial court" jury trial, the specter of which often acts as the "pressure valve" for reaching factual determinations in a typical trial court, especially in a summary judgment determination. The Court of Claims' limited, civil jurisdiction and the statutory provision for a three-judge panel in complex

---

[14] "In all other cases where the court of appeals finds error prejudicial to the appellant, the judgment or final order of the trial court shall be reversed and the cause shall be remanded to the trial court for further proceedings." App.R. 12(D).

cases such as this make App.R 12(D) the appropriate means for reversing the Court of Claims in Accurate's case.

{¶ 144} Thus, I would find that App.R. 12(D) provides this Court a means to address the basic, underlying error readily observable on de novo review. Accordingly, I would moot Accurate's six assignments of error and, in accordance with App.R. 12(D), find from our review of the record that prejudice to Accurate exists because of an unresolved basic material issue of fact. I would on this basis reverse the judgment of the Court of Claims and remand it for further proceedings consistent with this opinion.

_____